IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | |
|---|---|
| CAROLYN RAWLS, | ) |
| | ) |
|     Plaintiff, | ) |
| | )    CIVIL ACTION NO. |
|     v. | )    2:11cv59-MHT |
| | )       (WO) |
| ALABAMA DEPARTMENT OF | ) |
| HUMAN RESOURCES, | ) |
| | ) |
|     Defendant. | ) |

## OPINION

Plaintiff Carolyn Rawls, an African-American, brings this employment-discrimination lawsuit against defendant Alabama Department of Human Resources, charging it with race discrimination in violation of Title VII (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a & 2000e-2000e-17) and § 1981 (the Civil Rights Act of 1866, 42 U.S.C. § 1981, as enforced through 42 U.S.C. § 1983).[1]  Jurisdiction is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1343.  This cause is now

---

1.  "[Section] 1983 constitutes the exclusive federal remedy for violation by state actors of the rights guaranteed under § 1981."  Bryant v. Jones, 575 F.3d 1281, 1288 n. 1 (11th Cir. 2009).

before the court on the Human Resources Department's motion for summary judgment.  For the reasons that follow, the motion will be granted.


## I.  SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).


## II.  BACKGROUND

This case arises from an internecine budget dispute among several state agencies.  The Department of Human Resources provides essential services to Alabama residents, such as overseeing adoptions, distributing

2

food stamps, and investigating elder and child abuse.  To achieve these objectives, the department oftentimes has to run criminal background checks, a task that is handled internally by the Office of Criminal History Checks. This office, however, does not conduct all of its criminal background investigations.  It outsources this responsibility to the Alabama Department of Public Safety, which conducts the background investigation and then bills the Criminal History Checks Office for this service.

Rawls served as the Criminal History Checks Office's "Program Manager," functioning as its director.  Her immediate supervisor was Deputy General Counsel James Long (black).  Until February 2009, the office was housed in the Human Resources Legal Office, which was run by General Counsel Sharon Ficquette (white).  Rawls alleges that Ficquette racially discriminated against her by reprimanding her and transferring her to the Human Resources Office of Quality Control in February 2009.

Rawls was at the center of a protracted disagreement between the Office of Criminal History Checks and the Department of Public Safety over unpaid invoices for background checks. Since at least 2006, the two entities struggled to develop a coordinated electronic system for tracking invoices and payments between them. Public Safety implemented a software program that failed to rectify the situation; Human Resources also attempted to design a program to handle the invoices. Neither entity had successfully put in place a system by the fall 2008.

In October 2008, the Alabama Board of Adjustment--an agency charged with hearing monetary claims against the State--became involved in the ongoing dispute and served as a mediator between the Human Resources and Public Safety Departments. In this role, the board sought to reconcile the budgets of the two departments by sending Public Safety's pending claims to Human Resources and determining whether and how much Human Resources had paid already.

4

On October 20, 2008, the Adjustment Board sent a claim to Human Resources attorney Elizabeth Hendrix (black), who worked in the department's Legal Office and was tasked with resolving this dispute.  In Claim # 2009-0048, Public Safety sought a $ 217,055 payment for 12 past-due invoices for background checks provided to the Criminal History Checks Office.  Claim # 2009-0048 covered invoices from October 2007 to June 2008.

On November 4, 2008, Hendrix sent Rawls a memo alerting her to Claim # 2009-0048.  The memo instructed Rawls to review the claim and recommend appropriate action, such as making a payment to Public Safety, denying a payment, or requesting additional information. Rawls did not immediately respond to Hendrix.

Instead, on November 25, 2008, Rawls sent an email to Long, her immediate supervisor.  Rawls's email contained a chart with entries for every month between October 2007 and September 2008.  The chart had columns for invoices from Public Safety, bills from Human Resources, net

5

savings, and percentage paid.   That same day, Long forwarded Rawls's email to Hendrix, commenting that the "inability of the Department of Public Safety and [the Human Resources Department] to reconcile bills has been a problem for years."  Chart Email (Doc. No. 38-1) at 19. According to Hendrix, Rawls's chart was not "immediately useful to me in responding to [the Adjustment Board]" because it did not address the specific unpaid invoices in Claim # 2009-0048.  Hendrix Affidavit (Doc. No. 38-1) at 5.

On December 3, 2008, Hendrix received a second claim from the Board of Adjustment.   In Claim # 2009-0178, Public Safety sought a $ 78,201.50 payment for three past-due invoices for background checks conducted between July 2008 and September 2008.   On January 7, 2009, Hendrix sent the second claim to Rawls and asked for a response.

On January 14, 2009, Long sent Ficquette and Human Resources Commissioner Nancy Buckner (white) an email

detailing staff discord at the Criminal History Checks
Office; Rawls was copied on this email.  According to
Long, "[Criminal History Checks Office] staff are
complaining and feeling very much unappreciated by
management" despite numerous new electronic programs that
had just been implemented.  Long Email (Doc. No. 49-1) at
31.  Long approvingly mentioned that Rawls was doing the
best she could to keep office staff motivated.

On January 16, 2009, Hendrix sent another email to
Rawls demanding a response to Claim # 2009-0048 and Claim
# 2009-0178.  On January 26, Rawls replied to Hendrix by
saying that Human Resources had made "partial payments"
to Public Safety for fiscal year 2008.  Rawls also
explained that Human Resources had built a new software
program to review the invoices for fiscal year 2009.
Rawls-Hendrix Email (Doc. No. 38-1) at 32.  Next, on
January 29, 2009, Rawls copied Hendrix on an email where
she stated that she had just completed working through
the October 2007 invoices and that Public Safety would be

owed an unspecified additional payment.  And, on January
30, 2009, Rawls responded to the second Adjustment Board
claim and sent Hendrix an email with the same chart that
she had previously sent to Long.

Tensions reached a tipping point in early February.
On February 2, 2009, Rawls emailed Patricia Evans, a
Public Safety employee, about the October 2007 invoice
reconciliation.  Rawls informed Evans that the department
"will be eligible for an additional $ 8,330.00 payment
via [the Board of Adjustment] for 10-2007 after the
[board] hearing is held."  Rawls-Evans Email (Doc. No.
38-1) at 44.  According to Hendrix, Rawls never received
prior authorization to tell Public Safety that Human
Resources would pay $ 8,330 for the October invoice.

Also, on February 2, 2009, Paul Lista, a Human
Resources administrative assistant, sent Rawls an email
and copied Hendrix, stating that he had received a phone
call from Judy Earnest, an employee at the Alabama
Finance Department who handled Adjustment Board work.

8

Lista related that Earnest had expressed concern that Human Resources was attempting to circumvent the Board of Adjustment process.

Early in the morning on February 4, 2009, Evans called Hendrix to discuss Rawls's promise. Lista then forwarded Hendrix the email in which Rawls promised Evans the $ 8,330 payment. Hendrix memorialized these conversations in an email to Long, which reads in pertinent part:

> "Patricia [Evans] and her supervisor called the office this morning regarding the [Public Safety] claims. During the conversation, Ms. Evans referenced some communication that she had received from Carolyn Rawls regarding the amount that was owed and partial payments. I told her that [I] was unaware of any such communication[,] that the Department had not submitted an answer to the Board because we were still investigating and attempting to determine what was and was not owed to them. I later received an email from Paul [Lista], which details the information that Carolyn communicated to Ms. Evans at [Public Safety] regarding partial payment of the claim on February 2, 2009. As indicated below, Ms. Evans contacted the Board regarding that communication and

9

Carolyn's/[Human Resources Department]'s ability to make such payments.  <u>That explains why Judy [Earnest] at the Board called here on Monday, February 2, 200[9] and insinuated that the Department was seemingly circumventing the [Board of Adjustment] process.</u>  I don't understand how partial payments can be made once a claim has ben submitted to the Board.  It was my understanding that the Department loses the ability/authority to <u>legally</u> pay a claim that is outside of the current ... fiscal year and that such claims were to be submitted to the Board.

"Ms. Evans' supervisor expressed to me that he was not happy about the time that had elapsed between the time the work was performed by [Public Safety] personnel and the receipt of payment. He also expressed concern regarding what he described as the inability to reign Carolyn in about the recurring delay in payments.  He asked me who was 'running [Human Resources]' and whether that person was Carolyn because it was his understanding that we had a Commissioner."

Hendrix-Long Email (Doc. No. 38-1) at 42 (emphasis in original).

On February 11, 2009, Ficquette issued a reprimand to Rawls.  Ficquette's reprimand noted that the Office of

10

Criminal History Checks's process for reconciling bills from Public Safety was "burdensome, cumbersome, and far too time consuming." Reprimand (Doc. No. 47) at 8. The reprimand initially focused on Rawls's failure to respond promptly and adequately to Hendrix's memos concerning the two Adjustment Board claims. The reprimand further criticized Rawls for "expect[ing] Public Safety to develop a system for our tracking of what we paid" and for failing to develop an internal means of tracking clearances and paying pills due Public Safety. Id. at 9. Ficquette emphasized Rawls's $ 8,330 promise to Evans, stating that it was "an unauthorized promise to pay, binding the Department." Id. Ficquette recounted how this promise angered Evans and other Public Safety staff, caused a Public Safety supervisor to question Rawls's and the Human Resources Department's leadership, and exacerbated tensions between the two departments. Next, the reprimand detailed the Human Resources Department's interactions with Lista and the fact that Rawls's

behavior had led others outside the department to conclude that Human Resources was "seemingly circumventing the [Board of Adjustment] process." Id. at 10.

The reprimand concluded with a list of the ways Rawls violated state personnel rules. Specifically, the reprimand states that:

> "a. You have failed to put in place processes to allow for quick processing, tracking and monitoring of requests for clearances.
>
> "b. You have failed to put in place adequate processes to ensure obtainable, identifiable results in a timely manner.
>
> "c. You have failed to correct broken processes that you knew and have known about since as early as 2006.
>
> "d. You made a false statement to the [Board of Adjustment] without authority to do so.
>
> "e. You violated Department policy by keeping money orders in the [Office of Criminal History Checks] overnight and for as long as several months. Money orders are to be sent to the Office of Finance on the day of receipt. No money is to be kept in offices overnight.

> "f.    You    have    compromised    the
> Department's relationships with other
> agencies."

Id.  The "false statement" referenced in the reprimand is

Rawls's email to Evans.  The money orders mentioned in

the reprimand were found in Rawls's office; Rawls's

replacement  and  subordinates  provided  deposition

testimony that outdated money orders were discovered.

As a result of the reprimand, Rawls was removed from

her position as Office of Criminal History Checks Program

Manager.  She was replaced by Tommy Crabtree (white), who

became  acting  manager/director  of  the  office  effective

February 11, 2009.  Buckner also moved the office out of

the Human Resources Legal Office and placed it under the

supervision  of  Human  Resources  Chief  of  Staff  Nancy

Jinright.   According  to  both  Crabtree  and  Jinright,

Crabtree did not seek the Criminal History Checks Office

job and, in fact, voiced disappointment in his new

position.   Rawls's  supervisor,  Long,  was  also

reprimanded.

Rawls was immediately transferred to the Human Resources Department's Office of Quality Control, which performs monthly reviews of food-stamp cases to ascertain whether the recipients' eligibility has been correctly determined. She retained her status as a "Program Manager" and her pay remained the same. However, she no longer supervised any employees. She requested a private office, but was given the only available space in the office--a cubicle across the hall from her new supervisor. During her time at the Office of Quality Control, Rawls complained of frequent migraine headaches.

On February 17, 2009, Rawls submitted a rebuttal to her letter of reprimand. Her response categorically denied all charges against her and recited her accomplishments at the Office of Criminal History Checks. She then pointed out that a new electronic system to monitor background-check invoices would be in place the next day: February 18, 2009. Rawls admitted to communicating with Evans about the $ 8,330 payment but

stated that this was a "gesture to show that we were
working in good faith" and that she "was never advised
that I could not communicate with Public Safety about
their claim." Rawls Rebuttal (Doc. No. 47) at 14. Rawls
further stated that the "relationship between [the Human
Resources Department] and the Department has Public
Safety has been good," id., but that Public Safety was to
blame for the invoice confusion.  The rebuttal concluded
with an assertion that white supervisors--such as Cheri
Martin, who supervised the Human Resources information
systems office--involved with the invoice dispute were
not reprimanded or transferred.

On March 9, 2009, Rawls announced her intent to
retire effective April 1, 2009.  Rawls cited her
"unjustified removal" from the Office of Criminal History
Checks and the conditions at the Office of Quality
Control.  Rawls further stated that she was performing
work appropriate for a "Program Specialist," a lower

classification than a "Program Manager."  Rawls Letter (Doc. No. 36-2) at 5.

Meanwhile, on February 24, 2009, the Human Resources-Public Safety dispute was resolved with the entry of two consent judgments totaling $ 177,688.25. The consent judgments included a detailed chart indicating the claim number, month, amount requested, amount Human Resources paid, and balance due.  The consent-judgment chart was more precise and contained different figures from the ones Rawls had forwarded to Long and Hendrix.  <u>Compare</u> Rawls Chart (Doc. No. 38-1) at 40 <u>with</u> Consent-Judgment Chart (Doc. No. 38-1) at 51.


III.  DISCUSSION

Rawls asserts two race-discrimination claims: (1) the February 2009 reprimand and transfer to the Office of Quality Control; and (2) a constructive discharge.

16

A.  Reprimand and Transfer

Both Title VII and § 1981 "have the same requirements of proof and use the same analytical framework." Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).  Under the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a plaintiff has the initial burden of establishing a prima-facie case of unlawful employment discrimination by a preponderance of evidence.  Id. at 802.  In this case, because Rawls claims "racial bias in the application of discipline for violation of work rules," she may establish a prima-facie case by showing "either (a) that [she] did not violate the work rule, or (b) that [she] engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against [her] were more severe than those enforced against the other persons who engaged in similar misconduct." Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir. 1989).

17

If the plaintiff establishes a prima-facie case, the burden then shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for its employment action. The defendant has the burden of production, not of persuasion, and thus need not convince the court that the reason advanced actually motivated its action. Combs v. Plantation Patterns, 106 F.3d 1519, 1539 n.11 (11th Cir. 1997).

Once the defendant satisfies this burden, "the presumption of discrimination is eliminated and the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the [defendant] were not the real reasons for the adverse employment decision." Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000). In other words, a plaintiff must show that a defendant's

proffered   explanation   is   a   mere   pretext   for
discriminatory conduct.

The   parties   spend   considerable   time   briefing   the
question of whether Rawls has made out a prima-facie case
of   race   discrimination.     But   where   a   "court   has
sufficient evidence to determine whether the employee has
been a victim of discrimination, the court need not go
through the McDonnell Douglas burden-shifting process and
should   instead   reach   the   ultimate   issue   of
discrimination."   Shuford v. Alabama State Bd. of Educ.,
978 F. Supp. 1008, 1017 (M.D. Ala. 1997) (Thompson, J.).
"In most cases, the real question lies in whether the
employer's   legitimate   non-discriminatory   reason   is
pretextual."   Bailey-Potts v. Alabama Dep't of Public
Safety, 2012 WL 566820, *4 (M.D. Ala. Feb. 21, 2012)
(Thompson, J.).  This insight is particularly true where,
as here, a plaintiff's discriminatory-discipline claim
rests on whether the employee actually violated workplace
rules.

The Department of Human Resources has provided detailed evidence to support Ficquette's reprimand. The record includes numerous email conversations involving Rawls, Long, Hendrix, Evans, and Lista. These emails confirm the reasons given in Ficquette's reprimand for Rawls's transfer. For example, Rawls's email to Evans promising the $ 8,330 is in the record; the tension with Public Safety personnel and their complaints about Rawls's leadership are also documented.

Even Rawls's rebuttal cuts against her case. Rawls admits that she emailed Evans about the $ 8,300 payment, perhaps the most serious charge alleged by Human Resources. The invoice backlog is conceded by Rawls, but she blames Public Safety and diminishes her own responsibility for the problem. And while Rawls mentions the forthcoming (but unimplemented) software tracking program, it only went online in February 2009, three years after the two departments began having problems.

Indeed, the Office of Criminal History Checks was still processing invoices from October 2007 in February 2009.

In short, Human Resources submits that it disciplined Rawls because she violated work rules (the Evans email) and failed to keep up with background-check invoices sent by Public Safety.  Moreover, Human Resources declined to discipline Rawls's alleged white comparators because their involvement in the Human Resources-Public Safety dispute was not the same--their offices were not responsible for solving that problem.

Against this evidentiary backdrop, Rawls submits that Ficquette's actions were racially motivated.  See, e.g., Rawls Deposition (Doc. No. 36-1) at 70-71.  Rawls, however, does not provide any direct evidence of racial animus.  Rawls also cites deposition testimony from Long, her immediate supervisor, who claims that Ficquette was racially motivated when she transferred Rawls and disciplined him.  See Long Deposition (Doc. No. 54) at 138 ("Q: Do you believe that [the Rawls] reprimand was an

intentional discriminatory move on the part of Sharon
Ficquette?  A: I believe that it was part of the process
to get [Rawls] out of the way.").

While Rawls and Long allege racial discrimination at
the hands of Ficquette, the Department of Human Resources
has provided numerous critics of Rawls's ability to
perform her duties adequately.  The bulk of the evidence
concerned Rawls's interactions with Hendrix, who
repeatedly complained that Rawls's replies were tardy and
unresponsive to the actual question asked.  Human
Resources Commissioner Buckner was also part of the
decision-making process.  Buckner took the drastic step
of reorganizing the department after Rawls's transfer,
which is further evidence of the systematic problems at
the Office of Criminal History Checks.

Criticism of Rawls was not limited to her
supervisors.  Rawls's behavior angered Public Safety
personnel and deepened the strife between the two
agencies.  Even Rawls's subordinate employees testified

that the Office of Criminal History Checks was "very disorganized and dysfunctional" during her tenure. Stanton Deposition (Doc. No. 38-11) at 3.

Rawls has also failed to provide any white comparator who engaged in similar behavior but received less-severe punishment, evidence which if provided would have raised the specter of racially discriminatory treatment. "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees were similarly situated in all relevant respects." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam) (emphasis added).  The Eleventh Circuit Court of Appeals requires that "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999) (emphasis added).  Rawls was the sole Program Manager in the Office of Criminal History Checks.  While

23

she points to potential comparators in other divisions, none of these employees was responsible for overseeing the same type of backlogged invoice system. Most significantly, none of these individuals ever made a false statement concerning the Board of Adjustment reconciliation process to an out-of-agency employee. Thus, whether and to what extent Human Resources disciplined these other employees is irrelevant. Because these comparators are not "nearly identical," id., Rawls cannot use them to rebut Human Resources Department's legitimate, non-discriminatory rationale for its disciplinary decision against Rawls.

Ultimately, in support of her claim of race discrimination, Rawls asserts that Human Resources overreacted when it disciplined her and, therefore, race had to be a motivating factor in the decision-making process. But "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions." Elrod v. Sears, Roebuck and Co., 939 F.2d

1466, 1470 (11th Cir. 1991) (internal quotation marks omitted).  "The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance." Holifield, 115 F.3d at 1565.  Rawls's subjective belief that Human Resources overreacted and engaged in racial discrimination is insufficient to demonstrate that the department's legitimate, non-discriminatory rationale was a pretext for race discrimination.

Accordingly, the court finds that there is no genuine dispute that Human Resources reprimanded and transferred Rawls because she violated workplace rules and failed to implement an adequate system for processing background-check invoices.

B.  Constructive Dismissal

"A claim for constructive discharge requires the employee to demonstrate that the work environment and conditions of employment were so unbearable that a

reasonable person would be compelled to resign." <u>Virgo v. Riviera Beach Assoc.</u>, 30 F.3d 1350, 1363 (11th Cir. 1994).  As such, the court must engage in an objective inquiry and "do[es] not consider a plaintiff's subjective feelings about his employer's actions." <u>Doe v. Dekalb County School Dist.</u>, 145 F.3d 1441, 1450 (11th Cir. 1998).  "A reasonable employee is one who does not assume the worst or jump to conclusions too fast." <u>Hellums v. Webster Indus., Inc.</u>, 97 F. Supp. 2d 1287, 1297 (M.D. Ala. 2000) (Albritton, C.J.) (internal quotation marks omitted).

Here, Rawls contends that the conditions in the Office of Quality Control compelled her early retirement. Rawls argues that the cubicle-office space was objectively intolerable.  Rawls also believes that taking away her subordinate employees and diminishing her responsibilities indicated that she was effectively demoted.

Human Resources contends that Rawls cannot satisfy the high threshold for a constructive-discharge claim. Rawls was neither demoted nor was her pay impacted. Rawls was assigned to an important task--verifying food stamp recipients' eligibility.  And, while Rawls may have not had any employees to supervise and had to work in a cubicle, this hardly qualifies as objectively unbearable working conditions.  Rather, Rawls subjectively found the conditions intolerable: she served in the Office of Quality Control for under a month before submitting her retirement letter.  Because "hurt feelings are insufficient as proof of constructive discharge," id., Rawls's constructive-discharge claim must fail.[2]

Moreover, a statute prohibiting racial discrimination does not constitute "a general civility code for the American workplace." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).  Such a law, therefore,

_____

    2.  In the alternative, Human Resources submits that it is immune from suit under § 1981.  Because this court grants summary judgment on both the Title VII and § 1981 claims, it need not address the immunity argument.

27

"does not prohibit all constructive discharges, regardless as the nature of or motive behind the intolerable conditions that caused the discharge, that is, regardless as to whether the intolerable conditions were caused by the type of discriminatory ... conduct that [the law] was intended to address." Cowan v. Jackson Hosp. & Clinic, Inc., 572 F.Supp.2d 1286, 1292 (M.D. Ala. 2008) (Thompson, J.). Because Rawls has failed to put forth sufficient evidence establishing that the conditions leading to her allegedly compelled retirement were motivated, or any way connected, to the type of discrimination Title VII and § 1981 address, her constructive-discharge claim must fail.

\* \* \*

An appropriate summary judgment in favor of the Alabama Department of Human Resources and against Rawls will be entered.

DONE, this the 17th day of April, 2012.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE